ACCEPTED
06-15-00059-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
12/2/2015 1:48:23 PM
DEBBIE AUTREY
CLERK

## No. 06-15-00059-CV

_____

Texas Court of Appeals for the Sixth District at Texarkana

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
12/2/2015 1:48:23 PM
DEBBIE AUTREY
Clerk

_____

**Frankie Marie Miller, individually and as Personal Representative of the Estate of T.J. Miller,**

**Appellant,**

**v.**

**Janie Mullen, as Personal Representative of the Estate of John B. Mullen, M.D.,**

**Appellee.**

_____

On Appeal from the 76th Judicial District
Court of Titus County, Texas
Cause No. 36,865

_____

**Appellant's Brief and Appendix**

_____

Charles "Chad" Baruch
JOHNSTON TOBEY BARUCH, P.C.
3308 Oak Grove Avenue
Dallas, Texas 75204
Telephone: (214) 741-6260
Facsimile:  (214) 741-6248
Email: chad@jtlaw.com

*Counsel for Appellant*

**ORAL ARGUMENT (CONDITIONALLY) REQUESTED**

## Identity of Parties and Counsel

**Appellant Frankie Marie Miller, individually and as Personal Representative of the Estate of T.J. Miller**

*Counsel in the Court of Appeals:*
Charles "Chad" Baruch
Texas Bar Number 01864300
JOHNSTON TOBEY BARUCH, P.C.
3308 Oak Grove Avenue
Dallas, Texas 75204

*Counsel in the Trial Court:*
Windle Turley
Texas Bar Number 20304000
Patrick Wigle
Texas Bar Number 24058779
Turley Law Firm
6440 North Central Ewy.
Dallas, Texas 75206

**Appellee Janie Mullen, as Personal Representative of the Estate of John B. Mullen, M.D.**

Russell W. Schell
Texas Bar Number 17736800
Stephani R. Johnson
Texas Bar Number 00794034
SCHELL COOLEY, LLP
15455 Dallas Parkway, Suite 550
Addison, Texas 75001

**Trial Judge**
Hon. Danny Woodson
76th Judicial District Court
Titus County, Texas

i

# Table of Contents

Identity of Parties and Counsel ............................................................................. i

Table of Contents ............................................................................................... ii

Index of Authorities ......................................................................................... iii

Statement of the Case ........................................................................................ 1

Statement Regarding Oral Argument ................................................................... 1

Statement of Issues ........................................................................................... 1

Statement of Facts ............................................................................................. 2

Summary of the Argument ................................................................................. 5

Argument ......................................................................................................... 5

    1. Miller presented evidence that Dr. Mullen acted with wilful
    and wanton negligence ............................................................................... 7

    2. Miller presented evidence of causation ................................................... 17

Conclusion ..................................................................................................... 23

Certificate of Compliance ................................................................................ 23

Certificate of Service ...................................................................................... 24

Appendix:

 Tab 1: Final Judgment

## Index of Authorities

**Cases**

*City of San Antonio v. Pollock*,
  284 S.W.3d 809 (Tex. 2009) ............................................................13

*Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*,
  271 S.W.3d 238 (Tex. 2008) ..............................................................8

*Crocker v. Babcock*,
  448 S.W.3d 159 (Tex. App.—Texarkana 2014, pet. denied)................5

*Forbes, Inc. v. Granada Biosciences, Inc.*,
  124 S.W.3d 167 (Tex. 2003) ........................................................... 6-7

*Fougth v. Solce*,
  821 S.W.2d 218 (Tex. App.—Houston [1st Dist.] 1991, writ denied) ................17

*Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*,
  391 S.W.2d 41 (Tex. 1965) .................................................................5

*Kindred v. Con/Chem, Inc.*,
  650 S.W.2d 61 (Tex. 1983) .................................................................7

*King Ranch, Inc. v. Chapman*,
  118 S.W.3d 742 (Tex. 2003) ...............................................................7

*Lee Lewis Constr., Inc. v. Harrison*,
  70 S.W.3d 778 (Tex. 2001) .................................................................9

*Lenger v. Physician's Gen. Hosp., Inc.*,
  455 S.W.2d 703 (Tex. 1970) .............................................................22

*Kramer v. Lewisville Mem. Hosp.*,
  858 S.W.2d 397 (Tex. 1988) .............................................................22

*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*,
  289 S.W.3d 844 (Tex. 2009) ...............................................................5

*Merrell Dow Pharms., Inc. v. Havner*,
    953 S.W.2d 706 (Tex. 1997) ...............................................................................7

*Mobil Oil Corp. v. Ellender*,
    968 S.W.2d 917 (Tex. 1998) ...............................................................................12

*Park Place Hosp. v. Milo*,
    909 S.W.2d 508 (Tex. 1995) ...............................................................................17

*Sage v. Howard*,
    465 S.W.3d 398 (Tex. App.—El Paso 2015, no pet.) ..........................................16

*Skiles v. Jack in the Box, Inc.*,
    170 S.W.3d 173 (Tex. App.—Dallas 2005, no pet.), *rev'd on other*
    *grounds*, 221 S.W.3d 566 (Tex. 2007) ...................................................................5

*Transp. Ins. Co. v. Moriel*,
    879 S.W.2d 10 (Tex. 1994) ..........................................................................8, 13

*Travelers Ins. Co. v. Joachim*,
    315 S.W.3d 860 (Tex. 2010) ...............................................................................5

*Turner v. Franklin*,
    325 S.W.3d 771 (Tex. App.—Dallas 2010, pet. denied) ............7-9, 12, 13, 15-16

*Valence Operating Co. v. Dorsett*,
    164 S.W.3d 656 (Tex. 2005) ...............................................................................5

**Statutes and Rules**

TEX. CIV. PRAC. & REM. CODE § 74.153 (West 2011 & Supp. 2015) ......................7

TEX. R. CIV. P. 166a..................................................................................................6

## Statement of the Case

Frankie Marie Miller, individually and as Personal Representative of the Estate of T.J. Miller, sued John B. Mullen, M.D. for medical malpractice.[1] Dr. Mullen passed away during pendency of the lawsuit and Janie Mullen, personal representative of his estate, was substituted as defendant.[2] The trial court granted traditional and no-evidence summary judgment to Mullen.[3] Miller appeals.[4]

## Statement Regarding Oral Argument

Oral argument would not assist the Court materially in resolving this appeal. As a result, Miller does not seek oral argument. But if the Court schedules oral argument, Miller seeks to participate.

## Statement of Issues

The sole issue on appeal is whether the trial court erred in granting no-evidence and traditional summary judgment. This issue implicates the following questions:

1. Did Miller present evidence, sufficient to overcome the no-evidence motion and create a fact issue on the traditional motion, that Dr. Mullen acted with wilful and wanton negligence?

---

[1] C.R. 6-18, 63-74.
[2] C.R. 75-79.
[3] App. 1; C.R. 380.
[4] C.R. 405-06.

1

2.     Did Miller present evidence, sufficient to overcome the no-evidence motion and create a fact issue on the traditional motion, of causation?

**Statement of Facts**

On the morning of April 22, 2011, T.J. Miller underwent an epidural cervical steroid injection (ECSI) at Titus Regional Medical Center. Shortly afterward, Miller experienced intense neck pain; he returned to Titus at around 10:55 a.m.[5] Unknown to anyone at the time, medical personnel had nicked Miller's artery during the ECSI and he was bleeding internally.[6]

A Titus nurse took Miller to the emergency room, where he was placed under the care of Dr. John B. Mullen. Based upon Miller's neck pain, Dr. Mullen immediately was concerned that Miller either was having a heart attack or was bleeding internally (suffering hematoma) from the ECSI.[7] Dr. Mullen ordered an EKG to rule out a heart attack.[8]

By 11:07 a.m., the EKG had come back normal, suggesting that Miller was not suffering a cardiac event.[9] Nevertheless, at 11:15 a.m., Titus staff—at Dr. Mullen's direction—administered 325 milligrams of aspirin to

---

[5] C.R. 122, 126, 286-367.
[6] C.R. 256-57.
[7] C.R. 118, 130.
[8] C.R. 116-18, 239.
[9] C.R. 116, 122, 132.

Miller.[10] Dr. Mullen ordered this administration of aspirin despite later admitting that he knew—

- Miller had just received an ECSI,[11]

- The most likely causes of Miller's pain were a heart attack or internal bleeding from the ESCI,[12]

- Miller's EKG was normal, suggesting that he was not suffering a heart attack,[13]

- Administration of aspirin is "contraindicated" for patients experiencing bleeding because even low doses prevent blood from clotting,[14] and

- Bleeding into the spinal column can result in paralysis.[15]

Ultimately, Dr. Mullen diagnosed Miller with epidural hematoma—not the myocardial infarction for which he ordered the aspirin dosage.[16]

After taking the aspirin ordered by Dr. Mullen, Miller continued to experience severe pain and lost feeling in his right leg.[17] Finally, Dr. Mullen ordered an MRI to rule out hematoma. It revealed that Miller's spinal cord was flattened, compressed, and displaced into the anterior spinal canal.

---

[10] C.R. 123, 125, 246.
[11] C.R. 122, 245, 247-48.
[12] C.R. 118, 130, 235.
[13] 121-22, 132, 243, 244.
[14] C.R. 235-38.
[15] C.R. 249.
[16] C.R. 115, 130.
[17] C.R. 123.

Miller was transported immediately by air to a higher-level treatment facility for emergency procedures to decompress his spinal cord.[18]

During the subsequent surgery, Miller did not stop bleeding despite administration of several medications.[19] As a result of the bleeding, Miller was rendered paraplegic. Eventually, he developed pneumonia and sepsis, and died as the result of organ failure.[20]

Miller's widow, Frankie (acting both individually and in her capacity as the personal representative for Miller's estate), sued Dr. Mullen for malpractice.[21] Dr. Mullen sought no-evidence and traditional summary judgment arguing that (1) he did not act with the "wilful and wanton negligence" necessary for malpractice arising from emergency medical care, and (2) Miller lacked evidence of causation to show that he would not have suffered the prolonged bleeding but for administration of the aspirin. [22]

The trial court granted summary judgment without specifying its grounds.[23]

---

[18] C.R. 123-24, 126.
[19] C.R. 283.
[20] C.R. 284.
[21] C.R. 6-18, 45-57, 63-74. Miller also sued Titus Regional Medical Center but nonsuited those claims. C.R. 40-44.
[22] C.R. 80-208.
[23] App. 1; C.R. 380.

## Summary of the Argument

Miller presented evidence of wilful and wanton negligence sufficient to defeat no-evidence and traditional summary judgment. With regard to the objective element of this test, Miller's expert witness testified that Dr. Mullen's conduct was so far outside the governing standard of care that it engendered an "extreme risk" of potentially "lethal consequences" to Miller. With regard to the subjective element, Dr. Mullen admitted administering the aspirin despite concerns that Miller was bleeding internally, and with full knowledge of the attendant risks of prolonged bleeding and paralysis.

Miller also presented evidence of causation sufficient to defeat no-evidence and traditional summary judgment. Miller's expert testified unequivocally that Miller would not have experienced the prolonged bleeding and paralysis but for administration of the aspirin, which prevented clotting. According to the expert, in reasonable medical likelihood, Miller's injury was the result of Dr. Mullen's administration of the aspirin.

## Argument

Texas appellate courts review summary judgments using a *de novo* standard of review. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists

and that the movant is entitled to judgment as a matter of law. *Crocker v. Babcock*, 448 S.W.3d 159, 163 (Tex. App.—Texarkana 2014, pet. denied) (citing *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

When reviewing a summary judgment, an appellate court takes as true all evidence favorable to the nonmovant and indulges every reasonable inference in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Evidence favoring the movant's position will not be considered unless uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965).

Where a motion for summary judgment is based on different grounds and the order granting the motion fails to specify its basis, the appellant must show that each ground alleged in the motion is insufficient to support summary judgment. *Skiles v. Jack in the Box, Inc.,* 170 S.W.3d 173, 178 (Tex. App.—Dallas 2005, no pet.), *rev'd on other grounds*, 221 S.W.3d 566 (Tex. 2007).

To defeat a no-evidence motion for summary judgment, the nonmovant need only produce more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. TEX. R. CIV. P. 166a(i); *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172

6

(Tex. 2003). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Less than a scintilla of evidence exists when the evidence is "'so weak as to do no more than create a mere surmise or suspicion of a fact.'" *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

**1.     Miller presented evidence that Dr. Mullen acted with wilful and wanton negligence.**

Section 74.153 of the Texas Civil Practice and Remedies Code governs health care liability claims arising from the provision of emergency medical care in a hospital. It provides that in such claims, the claimant may prove deviation from the applicable standard of care "only if the claimant shows by a preponderance of the evidence that the physician or health care provider, with wilful and wanton negligence, deviated from the degree of care and skill that is reasonably expected of an ordinarily prudent physician or health care provider in the same or similar circumstances." TEX CIV. PRAC. & REM. CODE ANN. § 74.153 (West 2011 & Supp. 2015).

The meaning of "wilful and wanton negligence" under the statute is the same as gross negligence. *Turner v. Franklin*, 325 S.W.3d 771, 780-81 (Tex. App.—Dallas 2010, pet. denied). "Gross negligence, in turn, is

7

comprised of two elements—one objective and one subjective." *Id.* at 781 (citation omitted).

"First, viewed objectively from the actor's standpoint, the act or omission must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others, considering the probability and magnitude of the potential harm to others." *Id.* (citing *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008) and *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)). Under this element, the defendant's conduct must create an "extreme degree of risk" and involve "the likelihood of serious injury" to the plaintiff. *Id.* (citations omitted).

To meet the subjective component, the defendant must "have actual, subjective awareness of the risk involved and choose to proceed in conscious indifference to the rights, safety, or welfare of others." *Id.* (citations omitted). "[T]he plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care." *Id.* at 782 (citations omitted).

No rule categorically prohibits resolving the wilful and wanton negligence inquiry by summary judgment. *Id.* at 783. But issues concerning state of mind generally are best left to the finder of fact to resolve based on

all evidence and surrounding circumstances. *Id*. at 782-83. Consequently, determining whether a defendant acted with wilful and wanton negligence by summary judgment "usually will be inappropriate." *Id*.

The Texas Supreme Court has recognized the practical difficulty of producing direct evidence of conscious indifference, short of an admission by the defendant. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001). Because direct evidence of state of mind rarely is available, it can be proven by circumstantial evidence. *Id*.

The first prong of wilful and wanton negligence is the objective inquiry, requiring departure from the standard of care engendering an "extreme degree of risk" and "likelihood of serious injury" to the plaintiff. To meet this prong, Miller introduced testimony from Dr. James Vascik, a board certified neurosurgeon with emergency room experience.[24]

Dr. Vascik testified that Dr. Mullen's standard of care in this case was not altered by the fact that he treated Miller in the emergency room.[25] Dr. Vascik testified that Dr. Mullen had ruled out life-threatening causes of Miller's chest pain before administering the aspirin, meaning he was faced

---

[24] C.R. 251, 255, 263.
[25] C.R. 265.

9

with circumstances the same or similar to an emergency room neurosurgical consultation.[26]

According to Dr. Vascik, the normal EKG should have told Dr. Mullen to forego the aspirin and focus on hematoma.[27] Dr. Mullen had known Miller likely was suffering a heart attack or hematoma—and the EKG essentially ruled out the heart attack.[28] Dr. Vascik testified that Dr. Mullen had no possible reason to give Miller aspirin at the time he did so:

> Q: At the time that Dr. Mullen ordered 325 milligrams of aspirin for Mr. Miller, did he have any diagnostic result indicating that Mr. Miller was having a myocardial infarction?
>
> A: No. I believe the only test that he ordered that was back was an EKG, which was rendered normal.[29]

When asked whether administration of 325 milligrams of aspirin to a patient complaining of neck pain—but having a normal EKG result—was consistent with the standard of care, Dr. Vascik replied: "Absolutely not."[30]

As Dr. Vascik noted, then, Dr. Mullen administered the aspirin despite knowing Miller almost certainly was bleeding internally. Dr. Vascik testified that a risk of bleeding occurs whenever a patient receives a cervical

---

[26] C.R. 280.
[27] C.R. 276-77.
[28] C.R. 279.
[29] C.R. 203.
[30] C.R. 204.

10

injection.[31] Indeed, according to Dr. Vascik, this risk is so extreme that physicians will not even administer an ESCI if the patient has taken aspirin during the preceding 24 hours.[32]

Based on these factors, Dr. Vascik concluded that: "Dr. Mullen in my opinion, based upon the medical records and now his own testimony in his own deposition, took *extreme risk* by ordering aspirin for Mr. Miller. No justification for this order exists in light of the normal EKG."[33] According to Dr. Vascik, the consequences engendered by this "extreme risk" were "*potentially lethal*" to Miller.[34]

Dr. Vascik's testimony constitutes more than a scintilla of evidence that, viewed objectively, Dr. Mullen departed from the applicable standard of care to such an extent that he created an extreme risk of serious injury to Miller. This satisfies the objective prong of the wilful and wanton negligence standard, and is sufficient to defeat both the no-evidence and traditional motions for summary judgment.

With respect to the subjective inquiry, Dr. Mullen sought to disprove this element through testimony from Dr. Vascik confirming that he took a

---

[31] C.R. 270.
[32] C.R. 270-71.
[33] C.R. 375 (emphasis added).
[34] C.R. 204 (emphasis added).

11

number of steps that were "both medically indicated and correctly performed."[35] He then cited the following testimony by Dr. Vascik:

> Q: Would you agreed, sir, there is no evidence in this case that Dr. Mullen did not care for this patient?
>
> A: I see no such evidence.
>
> Q: No evidence that suggests that Dr. Mullen intended the unfortunate outcome, true?
>
> A: True.
>
> Q: No evidence to suggest that Dr. Mullen was consciously aware or indifferent to Mr. Miller's risk of paralysis?
>
> A: True.[36]

Dr. Mullen argued that this testimony conclusively disproved wilful and wanton negligence.[37]

Initially, evidence that Dr. Mullen provided care to Miller—even taking steps that were medically indicated and correctly performed—does not preclude a finding of wilful and wanton negligence as a matter of law. *Turner*, 325 S.W.3d at 784 (citations omitted). As the Texas Supreme Court has stated, "the fact that a defendant exercises some care does not insulate the defendant from gross negligence liability." *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 923-24 (Tex. 1998). The focus is the defendant's

---

[35] C.R. 90.
[36] C.R. 185.
[37] C.R. 82-91.

12

subjective mental state—not the defendant's exercise of care. *Turner*, 325 S.W.3d at 784 (quoting *Moriel*, 879 S.W.2d at 20).

Similarly, the fact that Dr. Mullen did not intend to harm Miller does not preclude a finding of gross negligence. "Gross negligence does not require proof that the defendant intended or tried to harm the plaintiff . . . ." *Turner*, 325 S.W.3d at 784 (citation omitted). Evidence that a physician "tried to care" for a patient and "did not intend to harm him" does not disprove gross negligence as a matter of law. *Id*. at 784.

Finally, Dr. Mullen argued that Dr. Vascik's testimony about conscious indifference disproved wilful and wanton negligence. But Dr. Vascik's speculation about Dr. Mullen's state of mind could not possibly prove or disprove anything. Indeed, such testimony legally constitutes no evidence and can be challenged for the first time on appeal. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009) (citation omitted). At best, then, Dr. Vascik's answer to this question simply constituted his personal view of the evidence—hardly "proof" of anything.

Gross negligence requires that the defendant was subjectively aware of the risk involved and chose to proceed in conscious indifference to the rights, welfare, and safety of others. *Turner*, 325 S.W.3d at 784 (citation omitted). And Dr. Mullen himself provided testimony sufficient to create a

13

fact issue concerning his awareness of the risk involved and conscious indifference to the potential harm to Miller.

Dr. Mullen admitted having two working diagnoses after initial examination of Miller: (1) heart attack, and (2) hematoma.[38] According to Dr. Vascik, once Miller's EKG came back normal, the risk of a heart attack was minimal and the real risk shifted to bleeding in Miller's cervical spine.[39] Dr. Mullen conceded knowing that aspirin thins the blood by inhibiting the clotting mechanism—he testified that administering aspirin to a patient who is bleeding will intensify and lengthen the bleeding,[40] and that even small doses can trigger this effect.[41] The more the patient bleeds, the more the bleeding compresses the spinal cord.[42] The more the spinal cord compresses, the greater the risk of paralysis.[43]

Based on his own testimony, then, Dr. Mullen admitted ordering the administration of aspirin even though he knew—

- Miller had just received an ECSI,[44]

- The most likely causes of Miller's pain were a heart attack or internal bleeding from the ESCI,[45]

---

[38] C.R. 118, 130.
[39] C.R. 204.
[40] C.R. 115.
[41] C.R. 115.
[42] C.R. 199.
[43] C.R. 131.
[44] C.R. 122, 245, 247-48.
[45] C.R. 118, 130, 235.

- Miller's EKG was normal, suggesting that he was not suffering a heart attack,[46]

- Administration of aspirin is "contraindicated" for patients experiencing bleeding because even low doses prevent blood from clotting,[47]

- The more the patient bleeds, the more the bleeding compresses the spinal cord,[48] and

- The more the spinal cord compresses, the greater the risk of paralysis.[49]

Yet he proceeded anyway. This evidence constitutes more than a mere scintilla of circumstantial evidence that Dr. Mullen was subjectively aware of the risk involved to Miller and chose to proceed in conscious indifference to Miller's safety. It also raises a fact issue sufficient to defeat the traditional motion for summary judgment.

This case is factually and conceptually similar to *Turner*. There, a patient arrived at the emergency room complaining of pain and swelling in his left testicle. The treating physician immediately suspected the patient had either epididymitis (an inflammation treated routinely with antibiotics) or testicular torsion (a condition that if left untreated for 4-6 hours results in loss of the testicle). *Turner*, 325 S.W.3d at 774. The physician ordered pain

---

[46] 121-22, 132, 243, 244.
[47] C.R. 235-38.
[48] C.R. 199.
[49] C.R. 249.

medication and an ultrasound to rule out torsion. The radiologist on call misinterpreted the ultrasound and reported no evidence of torsion, so the physician diagnosed the patient with epididymitis and discharged him with a prescription for antibiotics. *Id*. at 774-75. After losing the testicle, the patient sued the physician for wilful and wanton negligence. *Id*. at 775.

The physician sought summary judgment, arguing there was no proof of wilful and wanton negligence. He relied principally on testimony from the plaintiff's expert witness that he made the "wrong call" but did not demonstrate a "complete want of care" for the patient. The physician argued this negated the subjective component of gross negligence. *Id*. at 783. The Dallas Court of Appeals disagreed, holding that the physician failed to disprove gross negligence as a matter of law. *Id*. at 783-84.

The El Paso Court of Appeals reached a similar result in *Sage v. Howard*, 465 S.W.3d 398 (Tex. App.—El Paso 2015, no pet.). In that case, the patient alleged that he sustained a fracture during hip surgery performed by an emergency room physician. The physician sought and obtained summary judgment based on lack of wilful or wanton negligence. As in this case, no evidence suggested the physician did not care for the patient or intended to cause his injuries. The court of appeals reversed, holding that the physician's decision to perform the surgery without an x-ray, along with

expert testimony about the dangers of doing so and the physician's admission that he knew performing the procedure could result in a fracture, constituted more than a scintilla of evidence that the physician proceeded in conscious indifference of the patient's rights, safety, or welfare.

As in *Turner*, Dr. Mullen simply failed to disprove the possibility of gross negligence. As in *Sage*, more than a scintilla of evidence exists of wilful and wanton negligence. Dr. Mullen may ultimately prevail on this issue, but the issue—at least on this record—must be resolved by the jury.

## 2. Miller presented evidence of causation.

A medical malpractice claim requires proof that the defendant's breach of the standard of care caused the claimed injury. *See Fougth v. Solce,* 821 S.W.2d 218, 219 (Tex. App.—Houston [1st Dist.] 1991, writ denied). To satisfy this burden, the plaintiff must show to a reasonable degree of medical probability that the injuries and damages claimed were proximately caused by the defendant's breach of the standard of care. *See Park Place Hosp. v. Milo*, 909 S.W.2d 508, 511 (Tex. 1995) (citation omitted).

Dr. Mullen argued that Dr. Vascik's testimony failed to establish causation within reasonable medical probability.[50] Dr. Mullen relied on the following testimony from Dr. Vascik:

> Q: But we don't really know, do we sir? I mean, the fact of the matter was he was bleeding for some two hours before he presented to the Emergency department. He had ten out of ten pain. There is no question that he was going to have to be transferred to a higher level facility.
>
> A: I agree.
>
> Q: And there are patients that have this exact same complication without aspirin on board that end up paralyzed, true.
>
> A: Absolutely.[51]
>
> . . .
>
> Q: Would you agree, we don't know one way or the other whether or not Mr. Miller would have had the same outcome regardless of the aspirin?
>
> A: Fair enough.
>
> Q: In other words, we can't say within reasonable medical probability that the same sequella (*sic*) wouldn't have occurred even without the aspirin, true?
>
> A: Correct.[52]
>
> . . .

---

[50] C.R. 93-94.
[51] C.R. 182.
[52] C.R. 183.

18

Q: How much damage in your opinion was directly attributable to the aspirin alone?

A: We don't know because I don't have a controlled comparison to see what would have happened had he had his MRI scan without the aspirin onboard.

Q: There is not any way mathematically to calculate how much worse Mr. Miller was as a result of the aspirin administration?

A: There is not.[53]

. . .

Q: Can you cite me to any literature that tells me how much worse Mr. Miller's condition because as a result of the aspirin?

A: Of course not.[54]

But the summary judgment motion did not mention Dr. Vascik's answers to several other questions that followed:

Q: Would you agree with me that within a reasonable medical probability, that Mr. Miller would have had the exact same outcome even without the aspirin onboard?

. . .

A: No, I don't believe that.

Q: Why?

---

[53] C.R. 183.
[54] C.R. 183.

19

A: Because the aspirin continued the bleeding. It did not allow for a thrombus to develop that may have stopped the bleeding short of the development of paralysis and short of the development of the size of a clot that would require surgery.[55]

. . .

Q: What if any significance is it to you that after the administration of aspirin Mr. Miller was found to have developed weakness?

A: It is very important. It indicates to me that the aspirin inhibited the clotting mechanism, which allowed the patient to continue to bleed and that at some point that bleeding reached a critical mass and compressed the spinal cord.[56]

Q: I am going to ask you – I am going to give you a definition. I would like you to assume for me . . . that the definition of proximate cause is a cause that was a substantial factor in bringing about an event and without which such event would not have occurred . . . Now in order to be a proximate cause, the act or omission complained of must be such that . . . a neurosurgeon using ordinary care would have foreseen the event or some similar event might reasonably result therefrom . . . Given that assumption, the definition of proximate cause, can you tell me whether or not Mr. Miller's paralysis of his lower extremities was proximately caused by Dr. Mullen's prescription and subsequent administration of aspirin?

. . .

---

[55] C.R. 259-60.
[56] C.R. 272.

20

A: *Yes . . . it is my opinion that but for the inhibition of the clotting mechanism, this aspirin, I believe it is more likely than not that he would not have been paralyzed.*

Q: And can you give me the medical basis for your conclusion that more likely than not he would not be paralyzed had he not taken the aspirin?

. . .

A: We know that before the epidural steroid injection on the 22nd, that he obviously was not on an anticoagulant on anti-platelet drug when the administration of the steroid injection would have been placed. We also know that subsequently that he developed an epidural blood clot that was more likely than not present when he presented to the emergency room; but since he had normal clotting functions, *it is also likely that he would have stopped bleeding on his own at some point. The administration of aspirin precluded that happening.*[57]

Dr. Vascik went on to testify that: "[T]he bleeding either became more active or reached a critical mass and compressed the spinal cord *as a direct result of that aspirin administration*."[58] According to Dr. Vascik, "[t]he administration of aspirin in this case prevented the normal human clotting mechanism to 'kick in' and stop the active bleeding . . . Had the aspirin not been administered, it is reasonably medically probable that the blood clot

---

[57] C.R. 273-74 (emphasis added).
[58] C.R. 275 (emphasis added).

21

would not have continued to increase in size, and the operative surgeon would not have had difficulty in controlling the bleeding."[59]

Even Dr. Mullen conceded that a coagulation study performed at 11:10 a.m., before administration of the aspirin, showed Miller was not having a prolonged clotting time.[60] This constituted further evidence supporting Dr. Vascik's conclusion that the prolonged bleeding would not have occurred but for administration of the aspirin.

Dr. Vascik was not required to state his opinion in terms of any special phrase or specific percentage of probability; such a requirement would elevate the form of an expert's testimony over its substance. *See Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 707 (Tex. 1970). The standard simply requires testimony, with a sufficient basis, that the negligence was a  substantial factor in causing the injury, and that the injury would not have occurred without it. *Kramer v. Lewisville Mem. Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993) (citations omitted).

Dr. Vascik was unequivocal in stating his opinion that neither the prolonged bleeding nor the paralysis would have occurred but for Dr. Mullen's administration of the aspirin. Dr. Vascik explained the basis for that opinion. This testimony constitutes legally sufficient evidence sufficient

---

[59] C.R. 283.
[60] C.R. 241-42.

to overcome the no-evidence motion, and creates a fact issue sufficient to defeat the traditional motion.

## Conclusion

The trial court erred in granting summary judgment. As a result, the trial court's judgment should be reversed and the case should be remanded for further proceedings.

Respectfully submitted,

/s/Charles "Chad" Baruch
Texas Bar Number 01864300
**JOHNSTON TOBEY BARUCH, P.C.**
3308 Oak Grove Ave
Dallas, Texas 75204
Telephone: (214) 741-6260
Facsimile: (214) 741-6248
Email: chad@jtlaw.com

*Counsel for Appellant*

## Certificate of Compliance

This brief was prepared using Microsoft Word. Relying on the word count function in that software, I certify that this brief contains 4,427 words (excluding the cover, tables, signature block, and certificates).

/s/Charles "Chad" Baruch

23

**Certificate of Service**

The undersigned certifies that a true and correct copy of this instrument was served this 2nd day of December, 2015, by efiling and by email upon the following counsel of record:

Russell W. Schell
rschell@schellcooley.com
Stephani R. Johnson
sjohnson@schellcooley.com
SCHELL COOLEY, LLP
15455 Dallas Parkway, Suite 550
Addison, Texas 75001

/s/Charles "Chad" Baruch

**1**

CAUSE NO. 36865

| | | |
|---|---|---|
| FRANKIE MARIE MILLER, Ind. and as | § | IN THE DISTRICT COURT OF |
| Personal Representative of the Estate of | § | |
| T. J. MILLER, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | TITUS COUNTY, TEXAS |
| | § | |
| JOHN B. MULLEN, M.D., and | § | |
| TITUS REGIONAL MEDICAL CENTER | § | 76th JUDICIAL DISTRICT |
| Defendants. | § | |

## FINAL JUDGMENT

Came on to be heard Defendant Janie Mullen as the Executor of the Estate of John B. Mullen M.D.'s Motion for Summary Judgment. The Court, having considered the motion and evidence and Plaintiff's Response, is of the opinion that the Motion is well taken and is **GRANTED AND JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANT, JANIE MULLEN AS EXECUTOR OF THE ESTATE OF JOHN B. MULLEN, M.D.** It is therefore,

**ORDERED, ADJUDGED AND DECREED** that Defendant's Motion for Summary Judgment is **GRANTED** and that Plaintiff's claims are fully and finally disposed of on the merits and cannot be raised at a later date. This Order is a **FINAL JUDGMENT** in favor of Defendant.

SIGNED this _____8th_____ day of _____June_____, 2015.

PRESIDING JUDGE DANNY WOODSON
76th JUDICIAL DISTRICT
TITUS COUNTY, TX

**FILED**
AT /2:55 O'CLOCK ___P___ M

JUN 08 2015

DEBRA ABSTON, CLERK, DISTRICT COURT
TITUS COUNTY, TX
_____ DEPUTY

FINAL JUDGMENT
494631.1/ 405.0129

Page 1

380